**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------X  Case No.: 21-cv-03413
ALEXANDER OWHONDA,

                              Plaintiff,

                                                        **COMPLAINT**

            -against-


CREDIT ACCEPTANCE CORPORATION and
NORTHSHORE MOTOR LEASING LLC,

                              Defendants.
-------------------------------------------------------------------X

          Plaintiff, by and through his attorneys, FAGENSON & PUGLISI,

PLLC, upon knowledge as to himself and his own acts, and as to all other matters

upon information and belief, brings this complaint against above-named defendants

and in support thereof alleges the following:

<u>INTRODUCTION</u>

          1.        In a predatory maneuver which reinforces the public's negative

imagine of car dealers, defendant Northshore Motor Leasing LLC (or "Northshore

Motor" or "dealership") advertised a car for sale for one price, assured plaintiff when he

telephoned that was the sale price of the car, but in fact sold the car to plaintiff for a much

higher price, all without letting plaintiff know that it had increased the price of the car. To

add insult to injury, Northshore Motor fraudulently assured plaintiff the car was in good

mechanical condition when it was not, as not only were there several open and substantial

safety recalls on the car at the time of purchase, but the check engine and oil change

indicators appeared less than 24 hours after purchase, the car refused to start, and the engine soon thereafter became dangerously overheated. But this was only the beginning of the car's mechanical woes which beset plaintiff and which have continued to beset plaintiff to this day.

2.     Moreover, because Northshore Motor fraudulently and unlawfully failed to advise plaintiff of the prior use of the car, plaintiff purchased a car he never would have purchased. Indeed, even the advertised and agreed price of the car was fraudulently exorbitant in view of the undisclosed prior use.

3.     In addition, Northshore Motor fraudulently and unlawfully failed to disclose the accurate odometer reading to plaintiff or on required documents, and similarly failed to disclose the accurate odometer reading on the vehicle service contract which it forced plaintiff to purchase in order to get the loan, thereby fraudulently and unlawfully reducing the mileage for which plaintiff could have the use of the service contract.

4.     Northshore Motor mercilessly took advantage of plaintiff's youth and inexperience: at the time of purchase of the car plaintiff was only 20 years old and the co-buyer, his cousin, was even younger. This was the first time they were purchasing a vehicle. Plaintiff was just beginning his life as an adult and was carefully building good credit with no derogatory tradelines on his credit report. Moreover, Northshore Motor knew they would be crossing several state lines and travelling approximately 250 miles to get to the dealership in Syosset, New York from where they resided in Maryland. Northshore Motor took advantage of this knowledge too.

5.     Northshore Motor uses the retail installment contract form of defendant Credit Acceptance Corporation (or "Credit Acceptance"). This contract form is copyrighted by Credit Acceptance and carries certain pre-printed language mandated by Credit Acceptance. As recently as August 2020, the Massachusetts Attorney General sued Credit Acceptance for unfair and deceptive practices in the conduct of its subprime auto loan business. Both defendants have been the subject of many negative online reviews and complaints by consumers they have defrauded. Each defendant is well-aware of the fraudulent and deceptive business practices of the other and profit separately and together from the fraud they perpetrate on vulnerable and disadvantaged members of the public.

6.     Northshore Motor has ignored plaintiff's many telephone calls seeking the assistance which it promised plaintiff before plaintiff purchased the car.

7.     Automobile dealers and finance companies that perpetrate these fraudulent, abusive and oppressive acts on unsophisticated and unsuspecting consumers are bound to cause and do cause increased financial burdens and feelings of distress and helplessness in consumers, who often do not know what to do when a calamity such as this befalls them.

8.     Having been able to obtain no relief from defendants, plaintiff brings this action to right defendants' wrongs.

9.     Plaintiff brings this action seeking reformation of the retail installment contract due to fraud; damages against defendants pursuant to the Federal Motor Vehicle Information and Cost Savings Act, 49 U.S.C. § 32701 *et seq.*, (the Federal Odometer Act); damages against defendants pursuant to the federal Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*; damages against defendants pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*, as well as pursuant to the New York Vehicle and Traffic Law ("NYVTL") § 417 and 15 NYCRR 78.13(c); injunctive relief and damages against defendants pursuant to New York General Business Law ("NYGBL") §§ 349–350 for defendants' deceptive acts and practices and false advertising; damages against defendants for common-law fraud and relief against defendants pursuant to New York Motor Vehicle Retail Instalment Sales Act ("MVRISA")–New York Personal Property Law § 301 *et seq.*

## JURISDICTION AND VENUE

10.     Plaintiff re-alleges paragraphs 1-9 as if fully re-stated herein.

11.     This Court has federal jurisdiction pursuant to the Truth in Lending Act ("TILA"), 15 U.S.C. § 1640(e), the Federal Motor Vehicle Information and Cost Savings Act, 49 U.S.C. § 32701 and 28 U.S.C. § 1331. Supplemental jurisdiction exists over the state law claims pursuant to 28 U.S.C. § 1367 as they arise out of the same set of transactions forming the basis of the federal claims.

12.     This Court has venue pursuant to 28 U.S.C. § 1391(b) in that a substantial portion of the events or omissions giving rise to this action occurred in this District.

PARTIES

13.    Plaintiff re-alleges paragraphs 1-12 as if fully re-stated herein.

14.    Plaintiff is a natural person who at all relevant times resided in Baltimore, Maryland.

15.    Upon information and belief, defendant Credit Acceptance Corporation is a foreign business corporation incorporated under the laws of the State of Michigan.

16.    Upon information and belief, Credit Acceptance was and is duly authorized to do business and doing business in the State of New York.

17.    Defendant Northshore Motor Leasing LLC is a domestic limited liability company with a principal place of business in the County of Nassau, State of New York.

18.    Plaintiff entered into a consumer credit transaction with Northshore Motor Leasing LLC as contemplated by 15 U.S.C. § 1602(i), in that the money, property or services which were the subject of the transaction were primarily for personal, family or household purposes.

19.    Northshore Motor is a "creditor" within the meaning of 15 U.S.C. § 1602(g) and 12 C.F.R. § 226.2(a)(17) because at all relevant times Northshore Motor, in the ordinary course of its business, regularly extended consumer credit which is payable in more than four installments or for which the payment of a finance charge is or may be required, and Northshore Motor is the person to whom the debt arising from the consumer credit transaction was initially payable.

20.    The consumer transaction out of which this action arose is a transaction pursuant to the Federal Trade Commission "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

21.    Northshore Motor assigned the retail installment contract to Credit Acceptance Corporation.

22.    Credit Acceptance is liable to plaintiff for its own misconduct and, by virtue of the Holder Rule, is jointly and severally liable with Northshore Motor to plaintiff for the misconduct of Northshore Motor herein.

<u>FACTUAL ALLEGATIONS</u>

23.    Plaintiff re-alleges paragraphs 1-22 as if fully re-stated herein.

24.    In or around July 2020, Northshore Motor advertised for sale a 2013 Dodge Challenger automobile ("Vehicle") on its website.

25.    In the advertisement, Northshore Motor advertised the price of the Vehicle as $9,855.

26.    A copy of Northshore Motor's online advertisement is attached hereto as **Exhibit 1**.

27.    In or around July 2020, plaintiff also saw online on cargurus.com the Vehicle being advertised for sale by Northshore Motor.

28.    Plaintiff completed a pre-approval loan application on cargurus.com and obtained an annual percentage rate quote of 4%.

29.     Based on said quote of 4%, and with about $5,000 down payment on the price of the Vehicle, plaintiff expected the loan payment on the Vehicle would be approximately $100 per month for 60 months.

30.     After viewing the advertisement, on or about July 30, 2020 plaintiff telephoned Northshore Motor.

31.     On said telephone call, plaintiff spoke with Omar Rosario, a salesman at Northshore Motor.

32.     Plaintiff told Omar that he was interested in buying the Vehicle and asked Omar if the Vehicle was still available for sale.

33.     Omar told plaintiff the Vehicle was still available for sale.

34.     Plaintiff then asked Omar for the price of the Vehicle and Omar stated that the price of the Vehicle was $9,855, as advertised.

35.     Omar invited plaintiff to visit Northshore Motor to view the Vehicle.

36.     Plaintiff explained to Omar that he and his cousin, the intended co-buyer, would be travelling to Long Island from Maryland where they lived and that they would not be driving to Long Island but instead would be taking public transportation.

37.     Plaintiff further explained that he needed to know then from Omar that the Vehicle would be ready for delivery to him the following day if they decided to buy it, because he would need to drive it back to Maryland.

38.    Omar responded that as long as they completed the credit application on Northshore Motor's website and they got approved for financing, everything would be fine and they would be able to drive home with the Vehicle the same day as their visit.

39.    Plaintiff and his cousin completed a credit application on Northshore Motor's website as instructed by Omar.

40.    On August 1, 2020, plaintiff and his cousin took a Greyhound bus from Baltimore to Manhattan and then took the Long Island Rail Road train from Manhattan to Long Island, then a taxi to Northshore Motor.

41.    In all, the journey from Baltimore to Northshore Motor took at least five hours, plaintiff and his cousin having started their journey at 9 a.m. that day.

42.    Plaintiff and his cousin arrived at Northshore Motor at around 2:00 p.m.

43.    They asked for, and were subsequently greeted by, Omar.

44.    Omar Rosario was a salesman at Northshore Motor who dealt with plaintiff on August 1, 2020.

45.    Plaintiff asked Omar again to confirm the price of the Vehicle and Omar stated to plaintiff that the price was $9,855.

46.    Omar then showed plaintiff and his cousin the Vehicle in the showroom.

47.    Omar told plaintiff and his cousin that "we have had mechanics working on the car for months" and that "everything is in tip-top shape".

48.    Omar asked plaintiff and his cousin if they would like to test drive the Vehicle and they responded yes.

49.    Omar thereafter disappeared, leaving plaintiff and his cousin in the showroom waiting for Omar who needed to accompany them on the test drive.

50.    While they were waiting for Omar to return, another salesman from Northshore Motor approached plaintiff and his cousin and asked them if they were sure they were going to buy the Vehicle, telling them that if they did not buy the Vehicle he had another customer on the phone "right now" who really would like to buy it.

51.    This salesman would approach plaintiff and his cousin several other times while they were waiting in the showroom, repeatedly telling them that he had another customer ready to buy the Vehicle that day if they did not buy it.

52.    Plaintiff felt increased pressure to buy the Vehicle that same day or lose the Vehicle to the other customer whom the salesman kept telling them about.

53.    About an hour after he left the showroom, Omar re-appeared and asked if they were buying the Vehicle all in cash.

54.    Plaintiff responded that they were not buying the Vehicle all in cash, but instead were going to be making a down payment of between $4,500 to $5,000, and obtain financing for the remaining balance of the price, plus the usual and customary costs and fees of car purchase, such as sales tax, title, tags and dealer processing fee.

55.    Omar said he would begin to work on the papers, then once again he left plaintiff and his cousin in the showroom.

56.     After about another hour of waiting by plaintiff and his cousin, Omar re-appeared and asked them to complete another credit application.

57.     Plaintiff and his cousin pointed out that they had already completed a credit application on Northshore Motor's website, but Omar insisted they had to complete another application.

58.     Plaintiff and his cousin completed another credit application on paper and handed same to Omar.

59.     Omar told plaintiff and his cousin to go into the waiting area and wait there, following which Omar disappeared for a third time.

60.     Thereafter, plaintiff and his cousin were approached by Frank Ventimiglia.

61.     Frank Ventimiglia was the finance manager at Northshore Motor who dealt with plaintiff on August 1, 2020.

62.     Plaintiff and his cousin were also approached by Nicky Bryan, who appeared to plaintiff to be a receptionist at the dealership.

63.     Nicky Bryan was an employee at Northshore Motor who spoke with plaintiff on August 1, 2020.

64.     Plaintiff and his cousin then electronically provided to Northshore Motor certain financial documentation as requested by Frank.

65.     Frank then told plaintiff and his cousin that he would find a lender for their purchase, and then he and Nicky left plaintiff and his cousin in the waiting area.

66.    About forty-five minutes later, Frank re-entered the waiting area, along with a lady who appeared to plaintiff to be another receptionist.

67.    They congratulated plaintiff and his cousin, stating that they had been approved for a loan.

68.    Nicky then also re-entered the waiting area and asked plaintiff and his cousin again how much money they were going to pay down on the purchase; after they told her $5,000, Nicky and Frank again left the room, saying that they would have to negotiate with the lender, since they had somehow thought plaintiff and his cousin were going to pay down $7,000.

69.    Nicky mentioned that the lender they were contemplating was Credit Acceptance, who were "trustworthy" and with whom they had worked "plenty of times before".

70.    Plaintiff and his cousin were then again left alone; then, about forty-five minutes later, the same receptionist from earlier returned and told them that Credit Acceptance would give them the loan with the $5,000 down payment on the purchase.

71.     Omar returned to plaintiff and his cousin and mentioned that they needed to obtain insurance, which they did.

72.    While plaintiff and his cousin were still in the waiting area, Omar asked them for the $5,000 down payment.

73.    Plaintiff gave Omar cash of $3,000 and a debit card for payment of the remaining $2,000.

74.    Omar left with the cash and debit card and then returned with a receipt for the $5,000 down payment.

75.    The Northshore Motor receipt for the $5,000 down payment is attached hereto as **Exhibit 2**.

76.    Thereafter, Omar invited plaintiff and his cousin to Frank's office, stating that they needed to finalize the transaction.

77.    Plaintiff and his cousin sat in the office across a desk from Frank.

78.    While in his office, Frank told plaintiff and his cousin that Northshore Motor had spent $2,000 for repairs on the Vehicle; that Northshore Motor had replaced the tires on the Vehicle; Frank also told them that Northshore Motor would help with any possible future repairs, and that Northshore Motor looked out for its customers.

79.    Frank then told plaintiff and his cousin that he was going to "finish you up and get you home" and that he needed them "to sign a couple of things and then you'll be good to go".

80.    Frank then asked plaintiff and his cousin to sign on an electronic signature pad, which they did.

81.    A computer monitor was on the desk and the screen on the monitor was turned towards Frank and away from plaintiff and his cousin.

82.    Neither plaintiff nor his cousin could see the computer screen.

83.    Neither plaintiff nor his cousin could read any writing that may have been on the computer screen.

84.     Frank electronically attached the signatures of plaintiff and his cousin to several documents.

85.     Neither plaintiff nor his cousin could see the documents to which Frank was attaching their signatures.

86.     Frank operated the mouse on the computer.

87.     Neither plaintiff nor his cousin operated the computer mouse so as to attach their signatures knowingly to any document.

88.     Frank did not give either plaintiff or his cousin a paper copy of any document before Frank had them sign the electronic signature pad and before Frank electronically attached their signatures to the several documents.

89.     These documents included the retail installment contract, as plaintiff would later discover.

90.     Frank did not inform plaintiff or his cousin about the final price of the Vehicle, or the interest rate on the loan, and did not inform them specifically about the documents to which he was attaching their signatures.

91.     Plaintiff did not know to what documents Frank was attaching his signature.

92.     The sole occasion on which Frank became specific as to any document was when he informed plaintiff and his cousin that if they did not pay the loan the dealership would repossess the Vehicle.

93.     Frank also told plaintiff and his cousin that an extended warranty (vehicle service contract) came with the loan.

94.     Frank did not ask plaintiff and his cousin whether they wanted a service contract.

95.     Plaintiff and his cousin did not tell Frank or anyone else at the dealership that they wanted a service contract.

96.     Frank did not give plaintiff and his cousin an opportunity to decline the service contract.

97.     Frank gave plaintiff and his cousin no choice but to accept the service contract if they wanted the loan.

98.     Frank did not inform plaintiff or his cousin of the price of the service contract.

99.     Frank kept telling plaintiff and his cousin that he was "trying to get you guys out of here. I know you want to go home".

100.    Frank told plaintiff and his cousin that the monthly payments would be $408.

101.    Plaintiff and his cousin balked at the high monthly payments, thinking that the monthly payments should have been no more than about $100 considering their $5,000 down payment.

102.    Frank then told plaintiff and his cousin that if they could not afford the monthly payments they could refinance the loan after six months so as to lower the monthly payments.

103.    By this time, it was well after 7 p.m. and plaintiff and his cousin had been at the dealership for more than five hours.

104.    As far as they could see, they were the last customers at the dealership.

105.    They were exhausted from all the waiting around they had been obliged to do at the dealership, especially in light of the fact that they had started their journey to New York at 9 a.m. and they were hungry.

106.    Just before they left Frank's office, he gave them certain documents to sign on paper.

107.    Neither plaintiff nor his cousin could read those documents.

108.    Frank pointed out on the papers where they should sign and instructed them repeatedly to just "sign here", "sign here", "sign here", while pointing to the area of the documents where he wanted them to sign.

109.    Neither plaintiff nor his cousin signed the electronic signature pad after they signed the paper documents.

110.    Plaintiff and his cousin signed the electronic signature pad before Frank had them sign the paper documents, as mentioned above.

111.    After they signed the paper documents, Frank told plaintiff and his cousin to go back out to the front of the dealership and wait for the Vehicle to be brought around to them.

112.    Frank gave them no paperwork to keep.

113.    Plaintiff and his cousin waited outside the dealership for more than 15 minutes for the Vehicle to be brought around them.

114.    While they were waiting, the same salesman from earlier approached them and told them it was good that they bought the Vehicle and it was a good Vehicle.

115.    Omar eventually drove the Vehicle around to plaintiff and his cousin.

116.    Omar exited the Vehicle, went back into the dealership and exited shortly after, carrying an envelope and a temporary tag.

117.    Omar placed the temporary tag on the back windshield of the Vehicle.

118.    Omar then turned to plaintiff and his cousin, waved the hand holding the envelope in the air, and told them that "this is not important; don't even look at this; put it in the glove compartment".

119.    Omar then gave plaintiff the envelope; plaintiff noticed the envelope was taped shut; plaintiff placed the envelope in the glove compartment without opening the envelope.

120.    Omar then stated he needed to take a picture of plaintiff and his cousin with the Vehicle for the dealership's website; he took the picture and gave them the key for the Vehicle.

121.    As there was only a quarter of a tank of gas in the Vehicle, plaintiff and his cousin drove to a nearby gas station and filled the tank with gas.

122.    Completely exhausted and hungry, plaintiff and his cousin then embarked on their journey back to Maryland.

123.   Plaintiff and his cousin never took the Vehicle for the test drive which Omar promised.

124.   The following morning, the Vehicle failed to start, despite plaintiff making several attempts to do so.

125.   In addition, the check engine indicator light appeared, as did the "oil change required" indicator.

126.   Plaintiff was shocked by the malfunctions not even 24 hours after his purchase of the Vehicle since Omar had repeatedly told him that the Vehicle had been fully serviced by mechanics and was in "tip-top shape", and Frank had told him that the dealership had spent $2,000 on repairs to the Vehicle.

127.   That day, relying on Frank's promises that if he had any problems with the Vehicle the dealership would help to fix them, plaintiff called Omar on Omar's mobile telephone three to four times per hour to complain that the Vehicle was malfunctioning and that he would like to return the Vehicle, calling in total approximately 14 times; however, Omar did not answer the telephone at first.

128.   When Omar finally answered the telephone, he told plaintiff to simply tighten the battery terminal in the trunk of the Vehicle, and he should then be fine.

129.   Omar also told plaintiff that that day was his day off, that he was not even at the dealership and that plaintiff should not call him again.

130.   After many more attempts to start it, the Vehicle finally started.

131.   However, the starting problems persisted in the days following.

132.    Then, a week after the purchase of the Vehicle, the check engine indicator light again appeared and the engine temperature gauge on the dashboard indicated that the Vehicle's engine was nearing the highest level of heat.

133.    Plaintiff immediately took the Vehicle to an auto repair shop on August 8, 2020.

134.    There, he was informed that the coolant fluid was leaking from the Vehicle, resulting in the Vehicle's engine being dangerously overheated and subject to combustion.

135.    The repair shop removed and replaced the thermostat, housing, water outlet pipe and coolant temperature sensor, all at a cost of $389.76.

136.    A copy of the repair shop's invoice is attached hereto as **Exhibit 3**.

137.    Plaintiff was dismayed that something as fundamental as the engine cooling system would not have been inspected and put in good repair by Northshore Motor before Northshore Motor sold the Vehicle to him.

138.    Because the starting problems persisted, plaintiff continued to call Omar in the days following to find out how Northshore Motor could assist him with the problems he was having with the Vehicle.

139.    However, Omar refused to answer plaintiff's telephone calls.

140.    Though plaintiff called the dealership, no-one at Northshore Motor answered plaintiff's telephone calls either.

141.    Perplexed and seeking information for help with the Vehicle, plaintiff removed from the glove compartment for the first time the envelope which Omar had told him to place there, released the tape holding the envelope shut, and read the documents that were in the envelope.

142.    This was the first time plaintiff was able to read the documents.

143.    The "Retail Instalment Contract" ("RIC") contained only the purported electronic initials and electronic signatures of plaintiff and his cousin.

144.    Plaintiff discovered on reading the RIC that the annual percentage rate on the loan was 22.99%, and not the 4% for which he and his cousin thought he had been approved through the cargurus website.

145.    Northshore Motor charged an annual percentage rate on the loan of 22.99%.

146.    Credit Acceptance charged an annual percentage rate on the loan of 22.99%

147.    Further, on reading the RIC, plaintiff discovered that the amount of the loan was $14,477.93, as evidenced by the "Amount Financed" on page 1 of the RIC and the "Amount Financed – Unpaid Balance" stated on page 2 of the RIC.

148.    The "Amount Financed" and the "Amount Financed – Unpaid Balance" as stated in the RIC was $14,477.93.

149.    This loan amount horrified plaintiff because he thought that the amount he and his cousin needed to borrow, with their down payment of $5,000, would have been no more than about $7,000, inclusive of the customary tags, title, taxes and dealer processing fee.

150.    Then, to his horror, plaintiff discovered that the Vehicle's "Cash Price" was stated in the RIC as $15,986, not the advertised and agreed price of $9,855, a fraudulent price increase of $6,131.

151.    Northshore Motor sold the Vehicle to plaintiff and his cousin for the price of $15,986.

152.    Northshore Motor added no accessories and made no improvements to the Vehicle so as to warrant an increase in the price of the Vehicle.

153.    Through its salesman Omar, Northshore Motor had represented to plaintiff that the price of the Vehicle was $9,855 and told plaintiff on the telephone in late July 2020 that it would sell him the Vehicle for $9,855.

154.    This price of $9,855 was the main reason plaintiff was interested in purchasing the Vehicle.

155.    As mentioned above, when plaintiff and his cousin arrived at the dealership on August 1, 2020, Omar confirmed to them that the price of the Vehicle was $9,855.

156.    At no point on August 1, 2020 did anyone at Northshore Motor mention that the price of the Vehicle had increased.

157.    If plaintiff had known that one or both defendants had increased the price of the Vehicle, plaintiff would not have purchased the Vehicle.

158.    Northshore Motor increased the price of the Vehicle because it intended to assign the RIC to a discount finance company that would charge a fee or otherwise delay compensation in consideration for accepting the RIC; in order to maintain what it considered to be a suitable profit margin on the transaction, Northshore Motor fraudulently increased the price of the Vehicle.

159.    This price increase would not have occurred in an all-cash transaction and was incidental to the extension of credit.

160.    Reading the RIC further, plaintiff also noticed that there was a price of $1,648 stated for the service contract.

161.    A service contract was listed on the RIC for a price of $1,648.

162.    Northshore Motor included a service contract on the RIC for a price of $1,648.

163.    Credit Acceptance included a service contract on the RIC for a price of $1,648.

164.    Plaintiff also noticed on the RIC that the service contract was for a term of 24 months or 24,000 miles.

165.    The service contract was for a term of 24 months or 24,000 miles.

166.    As mentioned above, neither plaintiff nor his cousin had asked for or wanted a service contract.

167.    In addition, plaintiff noticed that the odometer reading stated on the RIC was 135,811.

168.    The odometer reading as stated on the RIC was 135,811.

169.    However, the actual reading on the Vehicle's odometer on August 1, 2020 at the time of purchase was 136,903.

170.    The odometer reading stated on the RIC is false.

171.    The RIC is printed on a form which has been prepared and copyrighted by Credit Acceptance.

172.    Credit Acceptance copyrighted the form on which the RIC is printed.

173.    A copy of the RIC is attached hereto as **Exhibit 4**.

174.    A photograph of the Vehicle's dashboard showing the odometer reading of 136,903 on August 1, 2020 at the time of purchase, is attached hereto as **Exhibit 5**.

175.    Exhibit 5 is one of a series of photographs of component parts of the Vehicle which Northshore Motor maintained on its website when advertising the Vehicle for sale, up to and after August 1, 2020.

176.    On reviewing the service contract itself, plaintiff noticed it stated that the "Current Odometer Reading" was 135,811.

177.    A copy of the first page of the service contract is attached hereto as **Exhibit 6**.

178.    The odometer reading stated on the service contract is also false.

179.    The reading on the odometer on August 1, 2020 at the time of purchase was 136,903, as shown in Exhibit 5.

180.    The effect of stating the false and lesser odometer reading on the service contract is that, instead of being sold a service contract covering the first 24,000 miles of travel, the service contract defendants sold plaintiff actually covered 22,908 miles, which is 1,092 miles less: the difference between 135,811 and 136,903.

181.    The service contract contains only the purported electronic signature of plaintiff's cousin and the electronic signature of Frank Ventimiglia.

182.    The service contract does not contain plaintiff's signature.

183.    Reading further, plaintiff noticed that the invoice (or bill of sale) does not include the Vehicle's odometer reading.

184.    The invoice does not include the Vehicle's odometer reading.

185.    The invoice includes a line item charge of $37 for "N.Y. State Inspection Fee".

186.    The invoice contains the statement that Northshore Motor "certifies that the entire vehicle is in condition and repair to render under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

187.    The invoice contains the purported signature of plaintiff's cousin only.

188.    The invoice does not contain plaintiff's signature.

189.    The invoice does not contain the signature of any representative of Northshore Motor.

190.    A copy of the invoice is attached hereto as **Exhibit 7**.

191.    The purchase agreement (or contract of sale) includes a "Prior Use Certification" which contains a check mark in the box indicating "a police vehicle".

192.    The purchase agreement contains the purported signatures of plaintiff and his cousin.

193.    The purchase agreement also contains the signature of Frank Ventimiglia.

194.    At no time did anyone at Northshore Motor tell plaintiff that the Vehicle is a former police car.

195.    At no time did Omar tell plaintiff that the Vehicle is a former police car.

196.    At no time did Frank tell plaintiff that the Vehicle is a former police car.

197.    At no time did Nicky tell plaintiff that the Vehicle is a former police car.

198.    Former police cars are known to have a value substantially less than identical year, make, model and mileage vehicles because they are more heavily-used than indicated on their odometers by virtue of being in operation for two police shifts per day–the majority of the time either driving or with the engine idling–and are often involved in high-speed chases and crashes.

199.    For those reasons and more, if plaintiff had been informed by Northshore Motor that the Vehicle was a police car before he purchased it, he would not have purchased the Vehicle.

200.    Plaintiff has no reason to believe the "a police vehicle" box was checked on the purchase agreement before either he or his cousin is purported to have signed the purchase agreement.

201.    In any event, even if Frank gave the purchase agreement to plaintiff and his cousin for signature, he gave it to them for signature after plaintiff paid the $5,000 down payment to Omar while in the waiting area and also after Frank attached the electronic signatures of plaintiff and his cousin to the RIC.

202.    The purchase agreement includes a line item charge of $37 for "Inspection Fee".

203.    A copy of the purchase agreement is attached hereto as **Exhibit 8**.

204.    When plaintiff eventually received the certificate of title for the Vehicle from the Maryland Motor Vehicle Administration, plaintiff discovered that the odometer reading as stated on the title was a third number, 135,801; this was stated as the Vehicle's actual odometer reading as of August 1, 2020.

205.    The Vehicle's actual odometer reading as stated on the title was 135,801.

206.    This odometer reading stated on the title is false.

207.    The title does not contain the signature of a Northshore Motor representative, Northshore Motor's name or address, nor a certification that to the best of Northshore Motor's knowledge the odometer reading on the title reflects the actual mileage of the Vehicle, nor the date of transfer of ownership of the Vehicle; the spaces provided for these items of information on the back of the title are completely blank.

208.    A copy of the title is attached hereto as **Exhibit 9**.

209.    Plaintiff again called Northshore Motor, this time for an explanation of the papers, in addition to needing help with the Vehicle's malfunctioning, but no-one answered his calls.

210.    Problems with the Vehicle persisted: the Vehicle refused to start in regular mode; the Vehicle lurched when braking, had difficulty coming to a stop, and made a grinding noise when finally able to stop; the Vehicle emitted a noise while in operation (a low hum); the check engine light came on multiple times; the steering wheel would shake while the Vehicle was in operation; and the Vehicle would constantly pull to the left or right if the steering wheel were not gripped tightly.

211.    Due to all these malfunctions, on September 8, 2020, plaintiff took the Vehicle to a Dodge dealership in Maryland for examination.

212.    The examination revealed that the Vehicle's tires were bald and four new tires were needed along with a 4-wheel alignment; that both front and back brakes and rotors were bad and needed to be replaced; that the front control arms were faulty and needed to be replaced; that the suspension was faulty and needed to be replaced; in addition, the front windshield wipers needed to be replaced.

213.    Moreover, plaintiff was informed by the Dodge dealership in Maryland that there were open safety recalls on the Vehicle.

214.    One such recall was issued in 2018 or 2019 and concerned a faulty passenger air bag inflator.

215.    The manufacturer described the problem: "[i]n the event of a crash necessitating deployment of the passenger frontal air bag, these passenger air bag inflator may explode due to propellant degradation occurring after long-term exposure to absolute humidity and temperature cycling."

216.    The manufacturer described the consequence of explosion: "[a]n inflator explosion may result in sharp metal fragments striking the driver or other occupants resulting in serious injury or death."

217.    A similar but separate open safety recall was described by the manufacturer: "[u]pon deployment of the driver's frontal air bag, excessive internal pressure may cause the inflator to explode."

218.    The manufacturer described the consequence of explosion: "[i]n the event of a crash necessitating deployment of the passenger's frontal air bag, the inflator could explode with metal fragments striking the vehicle occupants potentially resulting in serious injury or death."

219.    The recalls are described by clearvin.com (last visited June 5, 2021) and attached hereto as **Exhibit 10**.

220.    Yet another recall still open on the Vehicle was issued between 2013 and 2016 and was for a faulty vapor cannister.

221.   A copy of the examination report of the Dodge dealership in Maryland is attached hereto as **Exhibit 11**.

222.   Plaintiff was further shocked and dismayed at these several fundamental and serious mechanical problems with the Vehicle, since Omar and Frank had assured him that "we have had mechanics working on the car for months", "everything is in tip-top shape", that Northshore Motor had spent $2,000 for repairs on the Vehicle; that Northshore Motor had replaced the tires on the Vehicle; that Northshore Motor would help with any possible future repairs; and that Northshore Motor looked out for its customers.

223.   In addition, many of these defects in the Vehicle were required to have been repaired upon an inspection of the Vehicle, which should have been performed by Northshore Motor and for which Northshore Motor charged plaintiff $37.

224.   Plaintiff paid $142.45 for the said examination report, the receipt for which is attached hereto as **Exhibit 12**.

225.   The Dodge dealership in Maryland repaired the open recalls on the Vehicle.

226.   At that time, plaintiff could not afford to repair any of the other defects.

227.   In or around early November 2020, plaintiff was forced to replace the brakes on the Vehicle at a cost of approximately $500.

228.   In addition, in or around November 2020, plaintiff was forced to replace the headlamps on the Vehicle.

229.    The Vehicle continued to stall when start-up was attempted, the traction control indicator light would illuminate, as well as the anti-lock braking system indicator light, in addition to all of the other unrepaired mechanical problems noted above.

230.    Plaintiff had still not received one return telephone call from Omar or anyone else at Northshore Motor.

231.    Unable to bear the persistent mechanical problems with the Vehicle, and with new problems continuing to emerge, on March 22, 2021 plaintiff took the Vehicle back to the Dodge dealership in Maryland for further examination.

232.    The examination revealed that the front wheel speed sensor was in need of repair because the bolt that held the speed sensor/brake line to the spindle had fallen out and the sensor wire was broken (cost: $235); front control arm strut bars needed to be replaced (cost: $869.84); 4-wheel alignment was needed (cost: $89.99); air conditioning cabin air filter needed to be replaced (cost: $80.14); rear side marker lamp bulb needed to be replaced (cost: $90.51); control module needed repair (cost: $84.76); various fluids and oils needed to be replaced (cost: $330.26); oil and filter change were needed (cost: $89.45); all for a total cost of $1,922.07 including tax.

233.    The March 22, 2021 examination report showing the total cost of repairs of $1,922.07 is attached hereto as **Exhibit 13**.

234.    On March 24, 2021, the Dodge dealership in Maryland further identified that all four tires still needed to be replaced; the suspension was still faulty and needed immediate repair/replacement; the transmission fluid and brake fluid needed to be replaced immediately; and the underlying problem causing the illumination of a dashboard warning light needed immediate attention; in addition, the driver-side window glass would not rise and close upon the closing of the door, as it was supposed to do.

235.    The total cost to perform these additional repairs was $976.75

236.    On March 24, 2021, the sole problems plaintiff could afford to fix were the control arm strut bars–and only with the assistance of the service contract which only partially covered that issue but covered none of the others, along with the performance of the 4-wheel alignment–and the replacement of the missing bolt that was in part causing the front wheel speed sensor problem.

237.    Plaintiff paid $422.42 out of pocket to correct just those problems.

238.    Regarding the control arm strut bars problem, the Dodge dealership in Maryland noted in the invoice on March 24, 2021 that the problem was due to the fact that the bushings were ripped and noisy.

239.    Regarding the speed sensor problem, the installation of the bolt fixed only part of the problem and the speed sensor still needed to be replaced.

240.    The March 24, 2021 examination report showing the total cost of repairs of $976.75 is attached hereto as **Exhibit 14**.

241.    The payment receipt for $422.42 is attached hereto as **Exhibit 15**.

242.    On or about May 14, 2021, the Vehicle refused to start, and even after the installation of a brand new battery–for which plaintiff paid $202.79–the Vehicle would not start.

243.    On May 21, 2021, plaintiff was forced to tow the Vehicle back to the Dodge dealership in Maryland, where the starting problem was diagnosed as a "loose connection at under hood IPM" ("integrated power module)".

244.    The dealership in Maryland further informed plaintiff that there are multiple after-market wiring harnesses installed on the Vehicle, and recommended to plaintiff the removal of the harnesses because they could be responsible for the drain on the battery which could be contributing to the starting problems.

245.    The dealership in Maryland charged plaintiff $140 to fix the loose IPM connection.

246.    A copy of the paid invoice dated May 28, 2021 for $140 diagnosing the IPM problem and containing the recommendation concerning the after-market wiring harnesses is attached hereto as **Exhibit 16**.

247.    Apart from great financial harm, the breakdown of the Vehicle caused plaintiff grave emotional distress and inconvenience, since he had to undertake alternative arrangements to get to and from work.

248.    The mechanical defects of the Vehicle render it, and rendered it at the time of delivery, unable to provide satisfactory and adequate service on the public highway.

249.    At the time of delivery and since, the Vehicle posed a danger to the life and safety of plaintiff and others.

250.    To date, plaintiff has been forced to make monthly payments on a fraudulently exorbitant loan that he cannot afford.

251.    Due to having to pay the monthly payments on the fraudulently exorbitant loan and pay for some of the necessary repairs to the Vehicle, plaintiff has had to use the sole credit card he owns more often than he otherwise would have, since he has few other source of funds.

252.    In addition, because he has had to pay the fraudulently exorbitant loan and pay for some of the necessary repairs to the Vehicle, plaintiff has not always been able to pay the bills on the credit card as the bills fell due.

253.    As a consequence of the additional usage of his credit card and plaintiff's inability to keep up with the credit card payments, plaintiff's credit score has plummeted more than 200 points since his purchase of the Vehicle.

254.    In or around December 2020, plaintiff requested a $1,000 increase in the credit limit of his credit card but he was denied because of his newly-poor credit standing.

255.    Before plaintiff's purchase of the Vehicle, plaintiff had no derogatory credit history.

256.    Meanwhile, the loan statements which Credit Acceptance sends to plaintiff each month reflects the gross unpaid balance of the loan, including unearned interest for the unexpired portion of the 5-year term, and not the net unpaid balance which would consist of the principal loan balance and earned interest only.

257.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer financial harm, including but not limited to the fact that plaintiff is now paying back a loan balance fraudulently increased by at least \$7,779 (\$6,131 + \$1,648); as a consequence, so far plaintiff has had to pay hundreds of dollars more on the car loan than what it was agreed he would have to pay based on the true price of \$9,855; so far plaintiff has had to pay more than \$2,300 in repairs on the Vehicle, which repairs Northshore Motor had promised him before the purchase would not be needed and even if they were needed, Northshore Motor would help to defray the cost of; due to defendants' fraud, plaintiff has lost his good credit rating and financial prospects.

258.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer emotional harm, including but not limited to: plaintiff fears for his safety, his family's safety and the safety of other users of the road owing to the defective condition of the Vehicle; plaintiff feels intense stress and anxiety from the financial pressure which burdens him, both from the fraudulently exorbitant loan and from the exorbitant and recurring repair costs of the Vehicle; plaintiff began to lose sleep due to worry concerning the Vehicle and the continued lack of sleep has developed into insomnia, which plaintiff has had to buy and use sleeping pills to combat; when plaintiff is able to fall asleep, he often experiences night terrors and has nightmares about

defendants repossessing the Vehicle because he could not keep up with the loan payments and him still being stuck with the fraudulently exorbitant loan, or nightmares about being in an accident and still being stuck with the fraudulently exorbitant loan; indeed one of plaintiff's nightmares has already come true: the Vehicle breaking down and being inoperable and him still being stuck with the fraudulently exorbitant loan; the stress and anxiety have also negatively affected plaintiff's eating habits and that and other physical manifestations have taken a toll on plaintiff's body and resulted in plaintiff having migraine headaches and panic attacks.

<u>AS AND FOR A FIRST CAUSE OF ACTION</u>

<u>Federal Odometer Act–49 U.S.C. § 32701 *et seq.*</u>

259.    Plaintiff re-alleges paragraphs 1-258 as if fully re-stated herein.

260.    At the time of plaintiff's purchase of the Vehicle, the odometer reading was 136,903 miles, as can be seen from Exhibit 5 hereto.

261.    The Federal Odometer Act required that defendants disclose on the title 136,903 actual miles as the mileage registered on the odometer.

262.    Defendants did not disclose on the title 136,903 actual miles as the mileage registered on the odometer, but instead disclosed on the title 135,801 actual miles, as can be seen from Exhibit 9 hereto.

263.    Defendants' disclosure of 135,801 miles on the title is false.

264.    Defendants' disclosure of 135,801 miles on the title is in violation of 49 U.S.C. § 32705 and the regulations thereunder.

265.    Defendants violated the Federal Odometer Act and regulations thereunder with intent to defraud plaintiff.

266.    As regards defendants' failure to disclose on the title the mileage registered on the odometer, 136,903, but instead disclosed 135,801 miles, defendants sought to defraud plaintiff out of 1,102 miles of usage of the Vehicle.

267.    For their failure to disclose on the title the mileage registered on the odometer, defendants are liable to plaintiff pursuant to 49 U.S.C. § 32710 for three times his actual damages or $10,000.00, whichever is greater.

268.    In addition to defendants' failure to disclose on the title the mileage registered on the odometer, Northshore Motor did not provide on the title the information required by the regulations made under the Federal Odometer Act, 49 C.F.R. 580.5.

269.    In particular, Northshore Motor did not sign the title, did not disclose its name or address on the title, did not disclose the date of transfer of ownership on the title, nor did Northshore Motor provide on the title the certification required by 49 C.F.R. 580.5(e)(1) that to the best of Northshore Motor's knowledge, the odometer reading reflects the actual mileage.

270.    For their failure to provide on the title these required items of information and the required certification, defendants are in violation of 49 U.S.C. § 32705 and the regulations thereunder.

271.    Defendants violated the Federal Odometer Act and regulations thereunder with intent to defraud plaintiff by not providing the items of information and the certification required by said regulations.

272.    For their failure to provide on the title these required items of information and the certification, defendants are liable to plaintiff pursuant to 49 U.S.C. § 32710 for three times his actual damages or $10,000.00, whichever is greater.

273.    In addition, defendants are jointly and severally liable to plaintiff for reasonable attorneys' fees, costs and disbursements pursuant to 49 U.S.C. § 32710.

274.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

## AS AND FOR A SECOND CAUSE OF ACTION

### TILA–15 U.S.C. § 1638(a)

#### (Misstatements Of TILA Disclosures)

275.    Plaintiff re-alleges paragraphs 1-274 as if fully re-stated herein.

276.    The amount financed disclosed on the RIC is $14,477.93.

277.    Defendants fraudulently and deceptively increased the amount financed to $14,477.93 by increasing the cash price by $6,131, from $9,855 to $15,986.

278.    Plaintiff did not have the actual use of $14,477.93 of loan.

279.    The RIC materially misstates the amount financed for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(2) and Regulation Z, 12 C.F.R. § 226.17.

280.    The finance charge disclosed on the RIC is $10,005.07.

281.    The finance charge disclosed on the RIC of $10,005.07does not include the fraudulent price increase of $6,131 which defendants added to the transaction only because plaintiff purchased the Vehicle on credit and which would not have been added had plaintiff purchased the Vehicle in a cash transaction.

282.    Further, the finance charge disclosed on the RIC of $10,005.07 does not include the fraudulent $1,648 charge for the service contract which defendants added to the transaction only because plaintiff purchased the Vehicle on credit and which would not have been added had plaintiff purchased the Vehicle in a cash transaction.

283.    The actual finance charge imposed by the RIC includes the hidden and fraudulent amounts of $6,131 and $1,648 charged by defendants incident to the extension of credit.

284.    Therefore, the actual finance charge imposed by the RIC was $7,779 greater, for a total finance charge of $17,784.07, not the disclosed finance charge of $10,005.07.

285.    The RIC therefore materially misstates the finance charge for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. § 226.17.

286.    The annual percentage rate disclosed on the RIC is 22.99%.

287.    By 15 U.S.C. § 1638(a)(4), the annual percentage rate is the finance charge expressed as a percentage.

288.    Because the finance charge disclosed on the RIC is materially misstated, the annual percentage rate is also materially misstated.

289.    The actual annual percentage rate imposed by the RIC is substantially greater than the 22.99% disclosed on the RIC.

290.    The actual annual percentage rate imposed by the RIC is well above 25%.

291.    The RIC materially misstates the annual percentage rate for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(4) and Regulation Z, 12 C.F.R. § 226.17.

292.    The total of payments disclosed on the RIC is $24,483.

293.    By 15 U.S.C. § 1638(a)(5), the total of payments is the sum of the amount financed and the finance charge.

294.    Because both the amount financed and the finance charge disclosed on the RIC are materially misstated and inflated, the total of payments is also materially misstated and inflated.

295.    The RIC materially misstates the total of payments for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(5) and Regulation Z, 12 C.F.R. § 226.17.

296.    The number of the monthly payments disclosed on the RIC is 60.

297.    The amount of each monthly payment disclosed on the RIC is $408.05.

298.    Plaintiff did not agree to pay $408.05 per month for 60 months.

299.    In fact, had defendants not added the fraudulent and deceptive finance charge of $7,779 as described above, the amount of each monthly payment would have been substantially less than $408.05.

300.    The RIC materially misstates the payment schedule for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(6) and Regulation Z, 12 C.F.R. § 226.17.

301.    The total sale price disclosed on the RIC is $29,483.

302.    By 15 U.S.C. § 1638(a)(7), the total sale price is the total of the cash price, additional charges and the finance charge.

303.    Because the cash price and the finance charge disclosed on the RIC are materially misstated, the total sale price is also materially misstated.

304.    The RIC materially misstates the total sale price for this consumer credit transaction, in violation of 15 U.S.C. § 1638(a)(7) and Regulation Z, 12 C.F.R. § 226.17.

305.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

306.    Defendants are jointly and severally liable to plaintiff in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

307.    Defendants acted willfully and knowingly in their misconduct herein.

<u>AS AND FOR A THIRD CAUSE OF ACTION</u>

TILA–15 U.S.C. § 1638(a)

(Failure To Provide TILA Disclosures Prior To Consummation)

308.    Plaintiff re-alleges paragraphs 1-307 as if fully re-stated herein.

309.    The TILA disclosures were contained in the RIC.

310.    Except for the RIC, the TILA disclosures were not included in any document which defendants provided to plaintiff.

311.    It was several days after plaintiff purchased the Vehicle and when he opened for the first time the envelope which Omar had given to him outside the dealership after the purchase, that plaintiff saw that the RIC contained his and his cousin's purported electronic signatures and electronic initials.

312.    Frank did not provide plaintiff with any document on paper before Frank had plaintiff sign the electronic signature pad.

313.    Frank did not provide plaintiff with the TILA disclosures on paper before Frank had plaintiff sign the electronic signature pad.

314.    Upon plaintiff signing the electronic signature pad, Frank attached plaintiff's purported electronic signature and electronic initials on the RIC.

315.    Frank placed the purported electronic signature and electronic initials of plaintiff on the RIC without first providing to plaintiff a copy of the TILA disclosures in a form plaintiff could keep.

316.    In fact, Frank did not even inform plaintiff of the contents of the documents on which Frank was placing plaintiff's electronic signatures and electronic initials.

317.    Frank did not give any document to plaintiff in a form he could keep, or at all.

318.    All documents on paper which Frank provided to plaintiff were re-taken by Frank and never returned to plaintiff by Frank.

319.    Defendants first gave plaintiff a copy of the required TILA disclosures in a form he could keep when, after the purchase of the Vehicle, Omar gave plaintiff the envelope containing certain documents as plaintiff waited outside Northshore Motor for Omar to bring him the Vehicle.

320.    Defendants failed to give plaintiff a copy of the required TILA disclosures in a form he could keep prior to the consummation of the transaction on August 1, 2020.

321.    Defendants failed to provide plaintiff with a copy of the required TILA Disclosures in a form he could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

322.    No-one at Northshore Motor provided plaintiff with a copy of the required TILA Disclosures in a form he could keep, or at all, prior to the consummation of the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 226.17(b).

323.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

324.    Defendants are jointly and severally liable to plaintiff in the amount of twice the finance charge, and for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640.

325.    Defendants acted willfully and knowingly in their misconduct herein.

<u>AS AND FOR A FOURTH CAUSE OF ACTION</u>

Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq*., NYVTL § 417, 15 NYCRR 78.13(c)

(Failure To Inspect The Vehicle And False Certification Of Roadworthiness)

326.    Plaintiff re-alleges paragraphs 1-325 as if fully re-stated herein.

327.    Plaintiff is a "consumer" within the meaning of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. § 2301 *et seq*.

328.    Northshore Motor is a "supplier" within the meaning of the MMWA.

329.    Northshore Motor is a "warrantor" within the meaning of the MMWA.

330.    The Vehicle is a "consumer product" within the meaning of the MMWA.

331.    Before it sold the Vehicle to plaintiff, Northshore Motor was required by 15 NYCRR 78.13(c) to inspect specified items of equipment and correct as necessary to ensure those items of equipment met the standards specified under said regulation.

332.    Only after performing the inspection and corrections required by 15 NYCRR 78.13(c), could Northshore Motor provide the certification specified in New York Vehicle and Traffic Law ("NYVTL") § 417 and 15 NYCRR 78.13(b).

333.    The certification specified in NYVTL § 417 and 15 NYCRR 78.13(b) is a statement that "[i]f this motor vehicle is classified as a used motor vehicle, the dealer named above certifies that the entire vehicle is in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

334.    Therefore, in addition to inspecting the items of equipment and making corrections as required by 15 NYCRR 78.13(c), Northshore Motor was required by NYVTL§ 417 to ensure that the *entire* Vehicle was otherwise roadworthy.

335.    The certification required by NYVTL § 417 is two-fold: Northshore Motor was required to certify that the Vehicle was inspected in accordance with 15 NYCRR 78.13(c) and it was required to certify that the Vehicle was roadworthy at the time of delivery, as required by NYVTL § 417 and 15 NYCRR 78.13(b).

336.    The certification required by NYVTL § 417 is a warranty of serviceability, is non-waivable and is implied in a dealer's sale of every used vehicle.

337.    As shown on the invoice, Northshore Motor charged plaintiff $37 for "N.Y. State Inspection Fee". See Exhibit 7 hereto.

338.    The same charge of $37 for "Inspection Fee" is also shown on the purchase agreement. See Exhibit 8 hereto.

339.    The certification required by NYVTL § 417 and 15 NYCRR 78.13(b), the warranty of serviceability, is contained in both the invoice and the purchase agreement.

340.    However, despite charging plaintiff an inspection fee Northshore Motor did not inspect the Vehicle.

341.    Despite charging plaintiff an inspection fee, Northshore Motor did not make an appropriate inspection of the Vehicle.

342.    Despite reciting the warranty of serviceability in certain documents, Northshore Motor did not deliver a roadworthy vehicle to plaintiff.

343.    Northshore Motor delivered the Vehicle to plaintiff on August 1, 2020, the day of purchase.

344.    On August 2, 2020, less than 24 hours after the purchase of the Vehicle, the check engine indicator light and the oil change required light appeared, and the Vehicle refused to start even after multiple attempts by plaintiff.

345.    In the following few days, the starting problems persisted and the check engine indicator light re-appeared.

346.    In addition, the engine temperature gauge on the Vehicle's dashboard indicated that the Vehicle's engine was nearing the highest level of heat.

347.    Frightened that the Vehicle would explode, less than a week after the purchase of the Vehicle plaintiff was forced to take the Vehicle to the auto repair shop for repair and service.

348.    The repair shop diagnosed the problem as "leaking from the water outlet [pipe] and thermostat".

349.    The repair work required a new water temperature sensor, a new thermostat housing and water outlet pipe and a new thermostat.

350.    The auto repair shop needed to "remove and replace thermostat, housing, water outlet pipe and coolant temperature sensor". See Exhibit 3 hereto.

351.    The starting problems persisted in the days following, and other problems became evident: the Vehicle lurched when braking, had difficulty coming to a stop and made a grinding noise when finally able to stop; the Vehicle emitted a noise while in operation (a low hum); the check engine light came on multiple times; the steering wheel would shake while the Vehicle was in operation; and the Vehicle would constantly pull to the left or right if the steering wheel were not gripped tightly.

352.    On September 8, 2020–barely a month after the purchase of the Vehicle–plaintiff was forced to take the Vehicle to a Dodge dealership in Maryland, where an examination revealed that the Vehicle's tires were bald and four new tires were needed along with a 4-wheel alignment; that both front and back brakes and rotors were bad and needed to be replaced; that the front control arms were faulty and needed to be replaced; that the suspension was faulty and needed to be replaced; in addition, the front windshield wipers needed to be replaced. See Exhibit 11 hereto.

353.    All the problems with the Vehicle were either problems which Northshore Motor was required to correct after the required inspection of the Vehicle under 15 NYCRR 78.13(c) or were problems which Northshore Motor was required to correct in compliance with the warranty of serviceability under NYVTL § 417.

354.    In addition, there were open safety recalls on the Vehicle, among which were recalls from 2018 and 2019 concerning exploding driver and passenger air bag inflators, which could result in serious injury or death. See Exhibit 10 hereto.

355.    These dangerous conditions were announced by the manufacturer and known since 2018 and 2019, yet Northshore Motor sold the Vehicle to plaintiff without fixing the conditions, in violation of the warranty of serviceability under NYVTL § 417.

356.    By March 2021–not yet eight months after the purchase of the Vehicle–there were additional defects evident on the Vehicle, including but not limited to: the four tires still needed replacement immediately; the suspension was still faulty and needed immediate repair/replacement; front control arm strut bars needed to be replaced; the transmission fluid and brake fluid needed to be replaced immediately; the underlying problem causing illumination of a dashboard warning light needed immediate attention.

357.    The two examination reports in March 2021 are attached hereto as Exhibits 13 and 14.

358.    These defects should have been identified and corrected by Northshore Motor before it delivered the Vehicle to plaintiff.

359.    Northshore Motor did not correct these defects before delivery of the Vehicle to plaintiff, in violation of the warranty of serviceability under NYVTL § 417 and 15 NYCRR 78.13(b).

360.    Plaintiff telephoned Northshore Motor repeatedly to inform Northshore Motor of the defects and to obtain the help promised by Frank in the event plaintiff encountered any mechanical defects with the Vehicle.

361.    Apart from the first day of plaintiff's possession of the Vehicle, August 2, 2020, when Omar eventually answered plaintiff's telephone call, Northshore Motor ignored all of plaintiff's calls.

362.    On August 2, 2020 Omar told plaintiff that plaintiff should not call him again.

363.    The warranty of serviceability is a warranty implied by New York State law, NYVTL § 417 and 15 NYCRR 78.13(b) and is an "implied warranty" within the meaning of the MMWA.

364.    The warranty of serviceability is also an express written warranty in plaintiff's purchase of the Vehicle, in that it is contained in the invoice and the purchase agreement and is a "written warranty" within the meaning of the MMWA.

365.    Northshore Motor has not established an "informal dispute settlement procedure" within the meaning of the MMWA with regards to plaintiff.

366.    Plaintiff's efforts to contact and communicate with Northshore Motor concerning the Vehicle's defects have been ignored by Northshore Motor.

367.    In violating the warranty of serviceability, Northshore Motor violated the MMWA, 15 U.S.C. § 2301 *et seq*.

368.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

369.    Defendants are jointly and severally liable to plaintiff for actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310(d).

## AS AND FOR A FIFTH CAUSE OF ACTION

### COMMON-LAW FRAUD

370.    Plaintiff re-alleges paragraphs 1-369 as if fully re-stated herein.

**Fraudulent Increase In Price**

371.    When plaintiff viewed Northshore Motor's advertisement for the Vehicle on cargurus.com, the advertised sale price for the Vehicle was $9,855.

372.    In or around late July 2020, Northshore Motor advertised the Vehicle on cargurus.com for a sale price of $9,855.

373.    In or around late July 2020, Northshore Motor advertised the Vehicle for sale on Northshore Motor's website.

374.    In or around late July 2020, Northshore Motor advertised the Vehicle for sale on Northshore Motor's website for the sale price of $9,855. See Exhibit 1 hereto.

375.    In or around late July 2020, Northshore Motor advertised the Vehicle in Northshore Motor's showroom for the sale price of $9,855. See Exhibit 1 hereto.

376.    Further, Northshore Motor's representative Omar represented to plaintiff when plaintiff spoke by telephone with Omar in late July 2020 that the sale price of the Vehicle was indeed $9,855.

377.    When plaintiff visited Northshore Motor in person on August 1, 2020, before he purchased the Vehicle, Omar again assured plaintiff that the sale price of the Vehicle was $9,855.

378.    Through its representative Omar, Northshore Motor represented to plaintiff before plaintiff purchased the Vehicle that Northshore Motor would sell plaintiff the Vehicle for $9,855.

379.    Northshore Motor in fact sold plaintiff the Vehicle for $15,986, $6,131 more than the advertised and agreed $9,855.

380.    The representation of Northshore Motor that it would sell plaintiff the Vehicle for $9,855 was a material fact of plaintiff's purchase of the Vehicle.

381.    This representation was false at the time it was made by Northshore Motor.

382.    Northshore Motor knew this representation was false at the time it was made by Northshore Motor.

383.    The representation was made by Northshore Motor for the purpose of inducing plaintiff to rely on it and to decide to purchase the Vehicle.

384.    At the time Northshore Motor made the representation to plaintiff, plaintiff did not know and had no reason or means to know that the representation was false.

385.    Plaintiff did reasonably, justifiably and rightfully rely on the representation of Northshore Motor as to the price of $9,855 in deciding to purchase the Vehicle.

386.    Plaintiff's decision to purchase the Vehicle was based on this representation of Northshore Motor that the price of the Vehicle was $9,855.

387.    Plaintiff would not have purchased the Vehicle had he known that defendants would increase the price of the Vehicle by $6,131.

388.    Plaintiff was gravely damaged by the false representation of Northshore Motor.

389.    Plaintiff was gravely damaged by the false representation of Northshore Motor in that Northshore Motor, individually and/or in concert with Credit Acceptance, inserted the inflated price of $15,986 into the RIC, instead of the advertised and agreed price of $9,855, thereby increasing the profit to defendants while rendering the Vehicle more expensive in every respect for plaintiff.

390.    Defendants are jointly and severally liable to plaintiff for the fraud detailed herein.

391.    Defendants are jointly and severally liable to plaintiff for actual, compensatory and punitive damages in an amount to be determined at the time of trial.

392.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

**Fraudulent Representation As To Condition Of Vehicle**

393.    On August 1, 2020, before plaintiff purchased the Vehicle, Northshore Motor through its representative Omar represented to plaintiff that "we have had mechanics working on the car for months" and "everything is in tip-top shape".

394.    Also on August 1, 2020, before plaintiff purchased the Vehicle, Northshore Motor through its representative Frank represented to plaintiff that Northshore Motor had spent $2,000 for repairs on the Vehicle; that Northshore Motor had replaced the tires on the Vehicle; that Northshore Motor would help with any possible future repairs to the Vehicle; and that Northshore Motor looked out for its customers.

395.    Moreover, Northshore Motor charged plaintiff $37 for a New York State inspection of the Vehicle.

396.    In charging plaintiff for inspection of the Vehicle, Northshore Motor represented to plaintiff that Northshore Motor had inspected the items of equipment designated by law and had made any necessary repairs so as to correct any defects found in said items of equipment.

397.    Northshore Motor also represented in the invoice and the purchase Agreement that Northshore Motor certified that "the entire vehicle was in condition and repair to render, under normal use, satisfactory and adequate service upon the public highway at the time of delivery."

398.    This certification of roadworthiness constitutes the implied, non-waivable warranty of serviceability.

399.    Northshore Motor in fact sold plaintiff an undisclosed former police car which, less than 24 hours after its delivery to plaintiff, refused to start, and whose engine became dangerously overheated necessitating a replacement of a portion of the Vehicle's cooling system barely a week after delivery; barely 30 days after the Vehicle's delivery to plaintiff an examination revealed that four new tires were urgently needed, front and rear brakes and rotors were urgently needed, the front control arm urgently needed replacement and the suspension was faulty and needed immediate repair, the headlamps needed replacement, in addition, safety recall conditions of exploding airbags known to exist years before Northshore Motor delivered the Vehicle to plaintiff had not been corrected by Northshore Motor, the windshield wipers needed replacement, fluids and oils in the Vehicle needed to be replaced, and the starting problems have persisted since the Vehicle's delivery.

400.    Correction of only some of these problems has cost plaintiff more than $2,300 so far.

401.    The representation of Northshore Motor that it would deliver to plaintiff a roadworthy vehicle was a material fact of plaintiff's purchase of the Vehicle.

402.    This representation was false at the time it was made by Northshore Motor.

403.    Northshore Motor knew this representation was false at the time it was made by Northshore Motor.

404.    The representation was made by Northshore Motor for the purpose of inducing plaintiff to rely on it and to decide to purchase the Vehicle.

405.    At the time Northshore Motor made the representation to plaintiff, plaintiff did not know and had no reason or means to know that the representation was false.

406.    Plaintiff did reasonably, justifiably and rightfully rely on the representation of Northshore Motor that the Vehicle was roadworthy in deciding to purchase the Vehicle.

407.    Plaintiff's decision to purchase the Vehicle was based on this representation of Northshore Motor that the Vehicle was roadworthy.

408.    Plaintiff would not have purchased the Vehicle had he known that the Vehicle was not roadworthy.

409.    Plaintiff was gravely damaged by the false representation of Northshore Motor that the Vehicle was roadworthy.

410.    Plaintiff was gravely damaged by the false representation of Northshore Motor in that the defective conditions in the Vehicle rendered its worth much less than even the advertised and agreed price of $9,855, which defendants fraudulently increased to $15,986; in addition to causing plaintiff great emotional distress as detailed above, the defective conditions caused plaintiff to fear for his safety, the safety of his family and that of other users of the road; due to plaintiff having to spend more than $2,300 on repairs which he could not afford, plaintiff's credit, which was impeccable before the purchase of the Vehicle, was ruined, his credit score fell more than 200 points

and he was denied a modest $1,000 increase in the credit limit of the sole credit card he owns.

411.    Defendants are jointly and severally liable to plaintiff for the fraud detailed herein.

412.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

413.    Defendants are jointly and severally liable to plaintiff for actual, compensatory and punitive damages in an amount to be determined at the time of trial.

<u>AS AND FOR A SIXTH CAUSE OF ACTION</u>

NYGBL § 349–Deceptive Acts And Practices

414.    Plaintiff re-alleges paragraphs 1-413 as if fully re-stated herein.

415.    Defendants owed a duty to plaintiff to transact business with plaintiff with reasonable care.

416.    Defendants breached said duty.

417.    Defendants breached said duty by (i) deceptively increasing the advertised and agreed price of the Vehicle by at least $6,131; (ii) deceptively informing plaintiff that he was required to purchase a service contract at a cost of $1,648 in order to obtain financing; (iii) deceptively and falsely stating on the title to the Vehicle that the odometer reading was 135,801 at the time of delivery, instead of the actual odometer reading of 136,903; (iv) deceptively and falsely stating on the service contract that the

odometer reading was 135,811 at the time of delivery, instead of the actual odometer reading of 136,903, thereby allowing plaintiff only 22,908 miles for which the service contract would be valid, instead of the ostensible 24,000 miles stated on the service contract; (v) deceptively failing to state on the invoice the mileage the Vehicle purports to have been operated as appears on the odometer of the Vehicle, in violation of 15 NYCRR 78.13(a)(3); (vi) deceptively failing orally to inform plaintiff that the Vehicle is a former police car; (vii) deceptively asking plaintiff for and accepting from plaintiff the $5,000 down payment and attaching plaintiff's electronic signature and initials to the RIC before giving to plaintiff for review and signature the purchase agreement with the "a police vehicle" box checked on the purchase agreement, in violation of 15 NYCRR 78.13(g); (viii) deceptively orally informing plaintiff that: "we have had mechanics working on the car for months", "everything is in tip-top shape"; Northshore Motor had spent $2,000 for repairs on the Vehicle; Northshore Motor had replaced the tires on the Vehicle; Northshore Motor would help with any possible future repairs on the Vehicle; and (viii) deceptively representing on the invoice and the purchase agreement that the Vehicle was roadworthy in violation of NYVTL § 417 and 15 NYCRR 78.13(b).

418.    Because of defendants' said fraudulent and deceptive acts and practices plaintiff is obligated on a fraudulently exorbitant loan at an effective interest rate well over 25% per year for the Vehicle, which is an unfair and unconscionable rate and which is not disclosed in the RIC.

419.    Defendants' said acts and practices were deceptive on their face.

420.    Defendants' deceptive acts and practices were committed by defendants in the conduct of a business, trade or commerce or the furnishing of a service within the State of New York and constitutes a violation of NYGBL § 349.

421.    Defendants' deceptive acts and practice were consumer-oriented.

422.    Defendants' deceptive acts and practices were consumer-oriented in that defendants' aforesaid misconduct in their business practices was not limited to plaintiff but extended to defendants' practices with other consumers within the State of New York.

423.    Defendants' acts and practices are recurring and directed at the public at large and said acts and practices are the sort that do easily recur, do impact similarly-situated consumers, and are therefore consumer-oriented.

424.    Defendants' aforesaid acts and practices therefore have a broader impact on consumers at large who purchase automobiles from defendants.

425.    Defendants' aforesaid acts and practices were also deceptive in a material way.

426.    Plaintiff has been injured as a result of defendants' misconduct.

427.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer financial harm, including but not limited to the fact that plaintiff is now paying back a loan balance fraudulently increased by at least $7,779 ($6,131 + $1,648); as a consequence, so far plaintiff has had to pay hundreds of dollars more on the car loan than what it was agreed he would have to pay based on the true price of $9,855; so far plaintiff has had to pay more than $2,300 in repairs on the Vehicle,

which repairs Northshore Motor had promised him before the purchase would not be needed and even if they were needed, Northshore Motor would help to defray the cost of; due to defendants' fraud, plaintiff has lost his good credit rating and financial prospects.

428.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer emotional harm, including but not limited to: plaintiff fears for his safety, his family's safety and the safety of other users of the road owing to the defective condition of the Vehicle; plaintiff feels intense stress and anxiety from the financial pressure which burdens him, both from the fraudulently exorbitant loan and from the exorbitant and recurring repair costs of the Vehicle; plaintiff began to lose sleep due to worry concerning the Vehicle and the continued lack of sleep has developed into insomnia, which plaintiff has had to buy and use sleeping pills to combat; when plaintiff is able to fall asleep, he often experiences night terrors and has nightmares about defendants repossessing the Vehicle because he could not keep up with the loan payments and him still being stuck with the fraudulently exorbitant loan, or nightmares about being in an accident and still being stuck with the fraudulently exorbitant loan; indeed one of plaintiff's nightmares has already come true: the Vehicle breaking down and being inoperable and him still being stuck with the fraudulently exorbitant loan; the stress and anxiety have also negatively affected plaintiff's eating habits and that and other physical manifestations have taken a toll on plaintiff's body and resulted in plaintiff having migraine headaches and panic attacks.

429.    Defendants have improperly profited from their deceptive acts and practices and have retained said profits.

430.    Plaintiff is a reasonable consumer within the meaning of the NYGBL and acted reasonably under the circumstances of this case.

431.    Defendants violated NYGBL § 349(a) and are liable to plaintiff under NYGBL § 349(h).

432.    Defendants acted willfully and knowingly in their misconduct herein.

433.    As a result of the above violations, plaintiff seeks injunctive relief against defendants and defendants are liable to plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

434.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

435.    Defendants are jointly and severally liable to plaintiff for violation of NYGBL § 349.

## AS AND FOR A SEVENTH CAUSE OF ACTION

NYGBL § 350–False Advertising

436.    Plaintiff re-alleges paragraphs 1-435 as if fully re-stated herein.

437.    Northshore Motor advertised the price of the Vehicle on its website as $9,855.

438.    Northshore Motor advertised the price of the Vehicle on cargurus.com as $9,855.

439.    Northshore Motor, through Omar, represented to plaintiff that the price of the Vehicle was $9,855.

440.    These representations were materially misleading and constitute false advertising pursuant to NYGBL § 350 because Northshore Motor increased the price of the Vehicle by $6,131 to $15,986 without plaintiff's knowledge or consent.

441.    Defendants acted willfully and knowingly in their misconduct herein.

442.    Plaintiff would not have purchased the Vehicle but for defendants' false advertising.

443.    Plaintiff has been injured as a result of defendants' misconduct.

444.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer financial harm, including but not limited to the fact that plaintiff is now paying back a loan balance fraudulently increased by at least $7,779 ($6,131 + $1,648); as a consequence, so far plaintiff has had to pay hundreds of dollars more on the car loan than what it was agreed he would have to pay based on the true price of $9,855; so far plaintiff has had to pay more than $2,300 in repairs on the Vehicle, which repairs Northshore Motor had promised him before the purchase would not be needed and even if they were needed, Northshore Motor would help to defray the cost of; due to defendants' fraud, plaintiff has lost his good credit rating and financial prospects.

445.    By reason of defendants' aforesaid fraudulent misconduct, plaintiff suffered and continues to suffer emotional harm, including but not limited to: plaintiff fears for his safety, his family's safety and the safety of other users of the road owing to the defective condition of the Vehicle; plaintiff feels intense stress and anxiety from the financial pressure which burdens him, both from the fraudulently exorbitant loan and from the exorbitant and recurring repair costs of the Vehicle; plaintiff began to lose sleep due to worry concerning the Vehicle and the continued lack of sleep has developed into insomnia, which plaintiff has had to buy and use sleeping pills to combat; when plaintiff is able to fall asleep, he often experiences night terrors and has nightmares about defendants repossessing the Vehicle because he could not keep up with the loan payments and him still being stuck with the fraudulently exorbitant loan, or nightmares about being in an accident and still being stuck with the fraudulently exorbitant loan; indeed one of plaintiff's nightmares has already come true: the Vehicle breaking down and being inoperable and him still being stuck with the fraudulently exorbitant loan; the stress and anxiety have also negatively affected plaintiff's eating habits and that and other physical manifestations have taken a toll on plaintiff's body and resulted in plaintiff having migraine headaches and panic attacks.

446.    Defendants have improperly profited from their false advertising and have retained said profits.

447.    Plaintiff is a reasonable consumer within the meaning of the NYGBL and acted reasonably under the circumstances of this case.

448.    Defendants violated NYGBL § 350 and are liable to plaintiff under NYGBL § 350-e.

449.    Defendants acted willfully and knowingly in their misconduct herein.

450.    As a result of the above violations, plaintiff seeks injunctive relief against defendants and defendants are liable to plaintiff for actual, compensatory, treble and punitive damages in an amount to be determined at the time of trial, and reasonable attorneys' fees, costs and disbursements.

451.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

452.    Defendants are jointly and severally liable to plaintiff for violation of NYGBL § 350.

## AS AND FOR AN EIGHTH CAUSE OF ACTION

MVRISA – New York Personal Property Law § 301 *et seq*.

453.    Plaintiff re-alleges paragraphs 1-452 as if fully re-stated herein.

454.    Each plaintiff is a "retail buyer" or "buyer" within the meaning of MVRISA § 301(2).

455.    Northshore Motor is a "retail seller" or "seller" within the meaning of MVRISA § 301(3).

456.    The sale transaction herein described involves a "retail instalment sale" or "sale" within the meaning of MVRISA § 301(4).

457.    The RIC is a "retail instalment contract" or "contract" within the meaning of MVRISA § 301(5).

458.    The MVRISA § 302(5)(1) provides that the RIC shall contain "[a]ll items required to be disclosed by the act of congress entitled "Truth in Lending Act" and the regulations thereunder, as such act and regulations may from time to time be amended."

459.    As more specifically detailed in the second cause of action hereinabove, the RIC did not disclose, among other things, the true finance charge, annual percentage rate, amount financed and schedule of payments, thereby violating MVRISA § 302(5)(1).

460.    Further, the MVRISA § 302(1) provides that the RIC shall contain "all the agreements of the parties".

461.    As more specifically detailed above, the RIC did not contain all the agreements of the parties in that it did not contain, among other things, the agreed price of the Vehicle of $9,855, thereby violating MVRISA § 302(1).

462.    Defendants' violations of the MVRISA were willful and knowing.

463.    Plaintiff has attempted to notify Northshore Motor of the aforesaid violations of the MVRISA and Northshore Motor has neglected, failed and refused to answer or respond to plaintiff's telephone calls.

464.    By reason of the foregoing violations of the MVRISA defendants are barred from recovering from plaintiff any credit service charge, delinquency or collection charge or refinancing charge on the RIC, and plaintiff is entitled to reasonable attorneys' fees, costs and disbursements.

465.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

466.    Defendants are jointly and severally liable to plaintiff for violation of MVRISA.

## AS AND FOR A NINTH CAUSE OF ACTION

### REFORMATION–UNILATERAL MISTAKE BASED ON FRAUD

467.    Plaintiff re-alleges paragraphs 1-466 as if fully re-stated herein.

468.    As more fully described hereinabove, defendants fraudulently increased the sale price of the Vehicle by $6,131.

469.    As more fully described hereinabove, defendants fraudulently included a service contract into the RIC at a cost of $1,648.

470.    Plaintiff would never have signed the RIC had Northshore Motor allowed him to read it before signing.

471.    In fact, before Omar gave plaintiff the envelope containing the purchase paperwork, which Omar had presumably received from Frank, Omar told plaintiff he did not even need to bother to read the paperwork contained in the envelope.

472.    It was only later in August 2020 when plaintiff released the tape Northshore Motor used to keep the envelope closed, opened the envelope, and removed the documents, that plaintiff was able to read the documents for the first time and begin to discover the extent of defendants' fraud.

473.    Plaintiff is entitled to reformation of the RIC to reflect the oral agreement between the parties on August 1, 2020 as set forth above.

474.    Plaintiff is entitled to enforce the RIC as reformed and is entitled to the benefits of the RIC as reformed.

475.    Plaintiff has no adequate remedy at law.

476.    Accordingly, plaintiff requests that the Court reform the RIC as set forth above.

477.    Credit Acceptance is liable to plaintiff pursuant to the "Holder Rule", 16 C.F.R. 433.2 and its New York state analog, New York Personal Property Law § 302(9).

478.    Defendants are jointly and severally liable to plaintiff for reformation of the RIC.

WHEREFORE, plaintiff respectfully prays that judgment be entered against Credit Acceptance Corporation and Northshore Motor Leasing LLC as follows:

(a)    reforming the RIC to reflect the oral agreement between the parties made on August 1, 2020, and for actual, compensatory and punitive damages;

(b)    awarding to plaintiff treble actual damages or $10,000.00 in statutory damages, whichever is greater, plus reasonable attorneys' fees, costs and disbursements in accordance with 49 U.S.C. § 32710;

(c)    awarding twice the finance charge, actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 1640;

(d)    awarding actual damages and reasonable attorneys' fees, costs and disbursements in accordance with 15 U.S.C. § 2310;

(e)    awarding actual, compensatory and punitive damages for common-law fraud in an amount to be determined at the time of trial;

(f)    enjoining each defendant from committing further deceptive acts and practices towards plaintiff, pursuant to NYGBL § 349;

(g)    awarding actual damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(h)    in the alternative to (g), awarding statutory damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(i)    awarding treble damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(j)    awarding punitive damages pursuant to NYGBL § 349 in an amount to be determined at time of trial;

(k)    awarding reasonable attorneys' fees, costs and disbursements pursuant to NYGBL § 349(h);

(l)    enjoining each defendant from engaging in false advertising, pursuant to NYGBL § 350;

(m)    awarding actual damages pursuant to NYGBL § 350 in an amount to be determined at time of trial;

(n)    in the alternative to (m), awarding statutory damages pursuant to NYGBL § 350 in an amount to be determined at time of trial;

(o)    awarding treble damages pursuant to NYGBL § 350 in an amount to be determined at time of trial;

(p)    awarding punitive damages pursuant to NYGBL § 350 in an amount to be determined at time of trial;

(q)    awarding reasonable attorneys' fees, costs and disbursements pursuant to NYGBL § 350-e;

(r)    awarding relief under MVRISA and reasonable attorneys' fees, costs and disbursements;

(s)      awarding pre-judgment interest; and

(t)      for such other and further relief as may be just and proper.

DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury on all issues so triable.

Dated: New York, New York
        June 16, 2021.


                                        /s/  Novlette R. Kidd
                                        NOVLETTE R. KIDD, ESQ. (NK 9339)
                                        FAGENSON & PUGLISI, PLLC
                                        450 Seventh Avenue, Suite 704
                                        New York, New York 10123
                                        Tel.: (212) 268-2128
                                        Nkidd@fagensonpuglisi.com